1  Robert V. Prongay (SBN 270796)
2      *rprongay@glancylaw.com*
   Leanne H. Solish (SBN 280297)
3      *lsolish@glancylaw.com*
4  GLANCY PRONGAY & MURRAY LLP
   1925 Century Park East, Suite 2100
5  Los Angeles, California 90067
   Telephone: (310) 201-9150
6  Facsimile: (310) 201-9160
7
8  *Counsel for Plaintiffs and Lead Counsel*

9              **UNITED STATES DISTRICT COURT**
10             **CENTRAL DISTRICT OF CALIFORNIA**
11

12  DOUGLAS BRAY, Individually and        Case No. 2:25-cv-01733-GW-KES
    On Behalf of All Others Similarly
13  Situated,                            **SECOND AMENDED CLASS
                                         ACTION COMPLAINT FOR
14                                        VIOLATIONS OF THE FEDERAL
                 Plaintiff,              SECURITIES LAWS**
15
16          v.                           **DEMAND FOR JURY TRIAL**
17  ROCKET LAB USA, INC., PETER
18  BECK, and ADAM SPICE,
19
                 Defendants.
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.      NATURE OF THE ACTION AND OVERVIEW ........................................... 1

II.     JURISDICTION AND VENUE .................................................................. 6

III.    PARTIES ................................................................................................ 7

IV.     SUBSTANTIVE ALLEGATIONS ............................................................ 9

        A.      Background Of The Company And Its Business ........................... 9

        B.      Rocket Lab's Neutron Rocket ..................................................... 9

        C.      The Truth Emerges And Defendants Admit Neutron's Launch Will Be Delayed.. 12

        D.      Following The End Of The Class Period, Defendants Further Delay Neutron's
                Launch ................................................................................... 17

        E.      By The Start Of The Class Period, Defendants Knew That Rocket Transportation
                Issues Would Delay Neutron's Initial Launch ........................... 19

V.      DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND
        OMISSIONS DURING THE CLASS PERIOD ....................................... 27

VI.     ADDITIONAL SCIENTER ALLEGATIONS .......................................... 28

        A.      Defendants' Knowledge Of And Access To Information About The Transportation
                Issues For Delivery Of Neutron Rocket Parts ........................... 28

        B.      Defendants Admitted That Neutron Was Material Significant To The Company And
                Were Motivated To Delay The Announcement Of The Launch Delay ................. 32

        C.      Corporate Scienter Allegations ............................................... 34

VII.    LOSS CAUSATION .............................................................................. 34

VIII.   CLASS ACTION ALLEGATIONS .......................................................... 36

IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET
        DOCTRINE) ........................................................................................ 38

X.      INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS
        CAUTION DOCTRINE ........................................................................ 40

XI.     CLAIMS FOR RELIEF .......................................................................... 41

XII.    PRAYER FOR RELIEF .......................................................................... 45

XIII.   JURY TRIAL DEMANDED .................................................................... 46

Lead Plaintiff Willie Croskrey and Plaintiff Douglas Bray (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Rocket Lab USA, Inc. ("Rocket Lab" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other public statements issued by and disseminated by Rocket Lab; (c) analyst and industry reports concerning Rocket Lab; (d) media reports about the Company; (e) interviews of former Rocket Labs employees and other potential witnesses with relevant information throughout the course of counsel's investigation; and (f) review of other publicly available information.[1]    Plaintiffs believe that certain relevant information is known only by defendants and is exclusively within their custody or control, and that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of persons and entities that purchased the publicly traded common stock of Rocket Lab between January 9, 2025 and February 25, 2025, inclusive (the "Class Period"), and who suffered economic losses as a proximate result of the alleged wrongdoing (the "Class").  Plaintiffs pursue claims pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Rocket Lab and two of the Company's senior executives, CEO Sir Peter Beck ("Beck") and CFO Adam Spice ("Spice") (collectively, "Defendants").

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

2.    Rocket Lab is a space company that provides launch services, spacecraft design services, spacecraft components, spacecraft manufacturing and other spacecraft and on-orbit management solutions.  Since 2017, Rocket Lab has provided launch services through its Electron rocket, a small orbital launch vehicle capable of deploying spacecraft of up to 300 kg to low Earth orbit.  In 2024, Electron was the second most frequently launched orbital rocket in the United States, behind SpaceX's Falcon 9.

3.    In March 2021, Defendants announced plans to develop a reusable-ready medium-capacity launch vehicle to increase the payload capacity of its space launch vehicles.  The Company refers to this vehicle as the Neutron Launch Vehicle ("Neutron").  Defendants intend for the Neutron to break the "medium launch monopoly" held by SpaceX's Falcon 9.  In May 2024, Rocket Lab announced it would conduct a test launch of Neutron in mid-2025, with three commercial launches in 2026 and five in 2027.  Since then, Defendants regularly made updates concerning the significant progress in Neutron's production, launch infrastructure, and development of the launch pad, while reiterating the mid-2025 debut launch for Neutron.

4.    However, on the morning of February 25, 2025, Bleecker Street Research published a report (the "Report") stating, among other things, that Rocket Lab "has materially misled investors about the likelihood that its Neutron rocket will launch in mid-2025."  Bleecker Street explained that it came to this conclusion after reviewing federal and state filings, technical reports, and conducting 23 interviews with industry experts, including former Rocket Lab engineers and executives, and determined that "[m]any aspects of RKLB's Neutron program remain far behind where they need to be: from engine development, to engine and structure production, to launch pad construction, to rocket transport to the launch site."  With respect to the rocket transportation delays, Bleecker Street explained that, based on its review of "technical documents and permitting information at the local, state, and federal levels.… a clear picture emerges that Rocket Lab will not be able to launch in 2025."

5.    The Report stated that due to Neutron's size, "there has been a lengthy and complex planning process about how to transport the large Neutron rocket components from where they are being constructed outside Baltimore."  Bleecker Street explained, that based on permits applied and issued, while at first Rocket Lab and NASA settled on a beach landing, by November 20, 2024, it appeared that a beach landing was no longer in consideration, and Rocket Lab intended to pursue an alternate method to deliver Neutron components to the launch site.  The Report continued that the "new option for rocket delivery appears to be dredging, which is even slower and will take years" based on a December 23, 2024 permit application to extract test samples, which would "be used for a later application to dredge the inland channel and bay for ship transit operations."  The Report noted that the actual permit application to dredge had yet to be filed and explained that it would likely take an additional 12-24 months from application to completion.

6.    On this news, Rocket Lab's share price fell $2.21, or 9.83%, to close at $20.28 per share on February 25, 2025, on unusually heavy trading volume.

7.    Just two days later, Defendants confirmed that the first Neutron launch would be delayed beyond the previously-communicated mid-2025 launch timeline. On February 27, 2025, Rocket Lab announced its 2024 annual financial results. Within that announcement, Defendant Beck was quoted as saying: "We rounded out the year with significant advancement across the Neutron program ahead of a planned debut launch in the second half of 2025."  Later that day, on an earnings conference call with investors and analysts, in response to a question on the change in timeline, Defendant Beck confirmed that "yes, we're … giving ourselves a little more time to get it to the pad and get the launch."

8.    By the start of the Class Period, public records show that Defendants knew transportation issues made it highly unlikely that the first test launch would occur in mid-2025.  While NASA, on behalf of Rocket Lab, submitted a permit application for three barge landing test events (frequently called a beach landing) in

July 2024 for Neutron rocket parts delivery to take place "between September 2024 to Mid-March 2025," by October 2024, NASA, on behalf of Rocket Lab, added a second, later time period for these test events to occur. Specifically, in an October 15, 2024, letter from NASA to the U.S. Fish and Wildlife Service requesting an essential fish habitat consultation, so that NASA could secure "authorization" for Rocket Lab for the three barge/beach landing test events, NASA stated that the "three test events would occur between fall of 2024 and March 14, 2025 or September 1, 2025, and March 14, 2026"—*i.e.*, either immediately before, or ***after*** mid-2025—and dropped any mention of when the launches were expected to occur. This suggests that Defendants knew these test events would not occur in the earlier window (between the fall of 2024 and March 14, 2025), such that the truly available first launch window did not even open until after September 1, 2025 (*i.e.*, well after "mid-" 2025).

9.    This delay in the transportation timeline is supported by Rocket Lab's later statements on November 20, 2024, to the Accomack County (Virginia) Board of Supervisors during a meeting in which Rocket Lab stated that it was facing transportation issues in getting Neutron to the launch pad, and that they were "currently working" on ideas to accommodate the size of the rocket—suggesting that Rocket Lab was either abandoning or was unsure if the barge/beach landing events would occur.

10.    And according to an employee with the U.S. Army Corps of Engineers, during a meeting held Thanksgiving week of 2024 with Rocket Lab, its consultant, and several state and governmental agencies, it was admitted that they believed they would miss the seasonal window for the barge/beach landing, and did not know how else to get Neutron's rocket components to the launch pad without dredging a navigation channel to Wallops. During the meeting, despite the fact that no permit application had yet been submitted, it was demanded that a dredging permit be issued by the end of the year so that Rocket Lab could meet their rocket launch scheduled

for July 2025.  In response, it was explained that issuing a permit by year-end was not feasible due to required notice periods under federal law.

11.    Despite the supposed urgency of dredging, Defendants only applied for a permit to take samples of the area they intended to dredge as of December 23, 2024, and did not even apply for a permit to dredge until March 11, 2025.  The dredging permit application explained that "there is no permanent existing means of providing safe and reliable access for large infrastructure deliveries to Wallops Island[,]" that "Neutron rocket components are very large in size … , making them difficult to reasonably transport by traditional transport methods like cargo plane, train or public roads without extensive roadway modification[,]" that "[i]n the expected transportation configuration, we would expect the height of a load to range 25 to 30 feet, more than double the height and width of a standard tractor-trailer[,]" and that "[t]herefore, the deliveries will be made by barge" so long as adequate water depths could be achieved (via dredging).  The dredging permit application explained that a barge/beach landing did not fit the purpose and needs for rocket delivery due to operational challenges and weather limitations, and also explained why other delivery alternatives were either infeasible or not practicable.

12.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the timeline for Neutron's debut launch.  Specifically, Defendants failed to disclose to investors that Defendants knew the debut launch for Neutron would be delayed until after mid-2025 due to issues with transporting Neutron's components to the launch site, including that Rocket Lab would miss the seasonal window for a barge/beach landing for smaller components and that, without an already issued permit for dredging, the Company would not be able to deliver the components in time for a mid-2025 launch.

13.    Despite knowing by the start of the Class Period that the mid-2025 launch date was not realistic or attainable, Defendants did not want to publicly push

out the launch date again, stating that the earlier delay of the initial Neutron launch was "painful."  Moreover, Defendants planned to raise equity and fund strategic acquisitions through a $500 million "at the market" ("ATM") offering, as announced on March 11, 2025, just two weeks after the end of the Class Period.  Under the ATM offering, Rocket Lab offers and sells shares of its common stock at current market prices: the higher the Company's share price, the fewer shares it has to sell to raise the needed equity.

14.    To date, it appears that the dredging permit still has not received federal approval, and thus, in July 2025, Rocket Lab submitted a permit application for an alternative, temporary method, called kedging, "which will allow workboats to navigate the channel safely prior to completion of the proposed dredging project."

15.    On November 10, 2025, Rocket Lab again delayed the date of its initial Neutron launch.  Neutron is now scheduled to arrive at the launch pad in Q1, 2026, with the first launch sometime thereafter.

16.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

17.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this

Judicial District. In addition, the Company's principal executive offices are in this District.

20.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

21.    Lead Plaintiff Willie Croskrey, as set forth in the certification previously filed with the Court, incorporated by reference herein (ECF No. 18-2), purchased Rocket Lab common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22.    Plaintiff Douglas Bray, as set forth in the certification previously filed with the Court, incorporated by reference herein (ECF No. 1), purchased Rocket Lab common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23.    Defendant Rocket Lab is incorporated under the laws of Delaware with its principal executive offices located at 3881 McGowen Street, Long Beach, California, 90808.  Rocket Lab's common stock trades on the NASDAQ exchange under the symbol "RKLB."[2]

---

[2] On May 23, 2025, Rocket Lab announced the completion of a corporate reorganization, pursuant to which Rocket Lab USA, Inc. became a wholly owned subsidiary of Rocket Lab Corporation.  As part of the reorganization, Rocket Lab's shares of common and preferred stock were automatically converted into shares of the new holding company, Rocket Lab Corporation, and Rocket Lab's common stock continues to trade on the NASDAQ under the same ticker symbol.

24.    Defendant Sir Peter Beck ("Beck") is Rocket Lab's founder and has served as Rocket Lab's President and Company's Chief Executive Officer ("CEO"), as well as serving on Rocket Lab's board of directors  since July 2013.  In May 2021, Defendant Beck was also appointed as Chairman of the Board.  Prior to founding Rocket Lab in 2006, Defendant Beck served in various engineering roles while building rockets in his own time.

25.    Throughout the Class Period, Defendant Beck spoke to investors and the market in public interviews.

26.    Defendant Adam Spice ("Spice") has served as Rocket Lab's Chief Financial Officer ("CFO") since May 2018.  Prior to joining the Company, Defendant Spice served as the Vice President and CFO of MaxLinear, Inc. from January 2011 until May 2018, and the CFO of Symwave Corporation from October 2009 to November 2010.

27.    Throughout the Class Period, Defendant Spice spoke to investors and analysts on conference calls.

28.    Defendants Beck and Spice (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

IV.    **SUBSTANTIVE ALLEGATIONS**

A.    **Background Of The Company And Its Business**

29.    Rocket Lab describes itself as an "end-to-end space company with an established track record of mission success."  As part of the Company's business, Rocket Lab designs, manufactures, and launches orbital and suborbital rockets to deploy payloads for a range of commercial and governmental missions.

30.    The Company was founded in 2006 by Defendant Beck in New Zealand, focusing on developing low-cost, small vehicle launches.  In 2009, Rocket Lab made history as the first private company in the Southern Hemisphere to reach space with the Atea-1 sounding rocket.  In 2013, Rocket Lab moved its registration to the United States and established its headquarters in California.

31.    Currently, Rocket Lab's launch services are provided via the Electron, a small orbital launch vehicle capable of deploying spacecraft of up to 300 kg to low Earth orbit.  As of the end of the Class Period, Electron has had 60 successful launches, delivering over 200 spacecraft to orbit for both private and public sector organizations.  Rocket Lab states that "[s]ince its maiden launch in 2017, Electron has become the leading small spacecraft launch vehicle," and that in 2024, Electron was the second most frequently launched orbital rocket by companies operating in the United States, behind SpaceX's Falcon 9.

32.    Rocket Lab went public in August 2021 via a reverse merger with a special purpose acquisition company called Vector Acquisition Corporation, providing the Company with $777 million in gross proceeds.  In announcing the completion of the merger, Rocket Lab stated that the proceeds were expected to, *inter alia*, "fund the development of the new reusable, 8-ton payload class Neutron rocket."

B.    **Rocket Lab's Neutron Rocket**

33.    In March 2021, Rocket Lab announced plans to develop a reusable-ready, medium-capacity launch vehicle to increase the payload capacity of its space launch vehicles to approximately 15,000 kg for expendable launches to low Earth

orbit and lighter payloads for reusable configurations and into higher orbits.  The Company refers to this vehicle as the Neutron.  As part of a video announcing the Neutron, Defendant Beck stated that the rocket would be "launching 2024."

34.    Rocket Lab further explained that the Neutron is to be tailored for commercial and U.S. government constellation launches, and ultimately, would be configurable for and capable of human space flight, enabling the Company to provide crew and cargo supply to the International Space Station.  Defendants have explained that Neutron would break the "medium launch monopoly" and would be a direct competitor to Falcon 9, SpaceX's medium-lift launch vehicle and currently the most-launched American orbital rocket in history.

35.    In connection with developing Neutron, on February 28, 2022, Defendants announced that Rocket Lab had selected Wallops Island, Virginia as the location for its first launch pad and production facility.  Defendants further explained that the launch pad for the Neutron rocket would be within the Mid-Atlantic Regional Spaceport ("MARS") facility located at the southern tip of National Aeronautics and Space Administration's ("NASA") multi-user Wallops Flight Facility, and that the Neutron Production Complex would be adjacent to NASA's Wallops Flight Facility.

36.    On May 6, 2024, Defendants announced that among the "major development milestones to date this year" for Neutron was the first assembly of the Archimedes engine, the rocket engine designed for the Neutron rocket, which was now ready for a hot fire engine test, and "major installations at the Neutron launch pad in Wallops, Virginia[.]"  Defendants further explained in the May 6, 2024, announcement that because Rocket Lab is "through some of the unknowns in the development program," they were able to update the schedule for the first launch of Neutron, which was "adjusted to no earlier than mid-2025."

37.    On August 8, 2024, Rocket Lab announced that it had successfully hot fired the Archimedes engine for the first time, while making significant progress in Neutron production, launch infrastructure, and further developed the launch pad at the

NASA Wallops facility.  During an earnings call held on August 8, 2024, Defendant Beck confirmed that Rocket Lab was "on track to first launch for mid next year." Defendants continued to reiterate this mid-2025 launch timeline throughout the second half of 2024 and the Class Period.

38.    Thus, in the months leading up to and throughout the Class Period, investors and analysts were focused on Neutron's development and timeline.  Indeed, Defendant Beck called 2025 the "year of Neutron," and during a February 1, 2025 podcast interview with Dom Harvey, Defendant Beck stated that "Neutron, our big rocket, is our biggest project."[3]  And Defendants explained multiple times that Neutron's success would be critical to the Company's finances.  For example, on November 12, 2024, Defendant Beck explained that the "first launch of Neutron is so important for us because that really has such a tremendous impact on the P&L[.]" Similarly, on January 14, 2025, Defendant Spice explained that getting Neutron "to the pad"—*i.e.*, launching it—"creates a big inflection point for our P&L" and will be a milestone financially for the Company.

39.    Just prior to the start of the Class Period, Defendants also began highlighting earnings opportunities for the Neutron rocket following its successful debut launch.  On November 12, 2024, Defendants announced that Rocket Lab signed its first launch agreement with a constellation operator for two early Neutron launches, further explaining that the contract "is in line with our previously discussed ASP [average selling price] for Neutron," which Defendants stated would be about $50-55 million.  Defendants also announced on November 12, 2024, that Neutron's expected debut launch puts it in a "strong position to on-ramp onto the U.S. Government's National Security Space Launch (NSSL) Lane 1 program, an indefinite

---

[3] This podcast interview, titled *Sir Peter Beck Opens Up on Childhood, Inspiration for Rocket Lab, Elon Musk & Jeff Bezos Competition*, is available at https://www.youtube.com/watch?v=U17It-CH4o4 (last visited Dec. 18, 2025).  This statement was made at approximately 23:17.

delivery indefinite quantity (IDIQ) contract valued at $5.6 billion over a five-year period," and further explaining that the NSSL Lane 1 program is the U.S. Space Force's program to build a reliable and domestic base of commercial launch vehicles to serve national security missions.

### C.    The Truth Emerges And Defendants Admit Neutron's Launch Will Be Delayed

40.    On February 25, 2025, at approximately 10 AM EST, Bleecker Street Research[4] published a report entitled "Rocket Lab (RKLB): We Think It's Gonna Be

---

[4] Bleecker Street Research publishes its "public short ideas" for Bleecker Street Capital, LLC, a "short-biased fund manager." Bleecker Street Research was founded in 2014 by Chris Drose, provides a contact email prominently on its website, and has published almost forty reports over the last eleven years. *See About*, BLEECKER STREET RESEARCH, https://www.bleeckerstreetresearch.com/about (last visited Dec. 18, 2025); *Research*, BLEECKER STREET RESEARCH, https://www.bleeckerstreetresearch.com/ (last visited Dec. 18, 2025).

In July 2024, Institutional Investor noted that "Drose's firm has had the best-performing short among 65 new major short activist campaigns, according to a review of short activist calls in the first six months of 2024 by Breakout Point, which tracks the industry." Michelle Celarier, *Founded in the Wake of the GameStop Short Squeeze, a Young Fund Makes Top Call in '24*, INSTITUTIONAL INVESTOR, Jul. 10, 2024 (available at https://www.institutionalinvestor.com/article/2dh9b0jtpekpdnrzh0mps/portfolio/founded-in-the-wake-of-the-gamestop-short-squeeze-a-young-fund-makes-top-call-in-24).

Institutional Investor explained that Bleecker Street's success was due to its short call on LuxUrban Hotels earlier in 2024, that Bleecker Street "revealed a "number of eyebrow-raising actions by LuxUrban," and that the company thereafter faced and reported numerous financial and operational problems. *Id.* In an earlier article, Institutional Investor explained that Chris Drose has been a well-known short seller since 2014, when he uncovered a "massive scandal at American Addiction Centers." Michelle Celarier, *Why This Former Kingsford Analyst Is Launching an Activist Short Fund, Short Selling Woes Be Damned*, INSTITUTIONAL INVESTOR, Jun. 29, 2021 (available at https://www.institutionalinvestor.com/article/2bswq9zr4bfq6n0j5mdq8/portfolio/wh (footnote continued)

---

a Long, Long Time" (the "Report").  The Report alleged, among other things, that Rocket Lab "has materially misled investors about the likelihood that its Neutron rocket will launch in mid-2025."  The Report explained that "[m]any aspects of RKLB's Neutron program remain far behind where they need to be: from engine development, to engine and structure production, to launch pad construction, to rocket transport to the launch site" after Bleecker Street reviewed "dozens of federal, state, and local filings, analyzed thousands of pages of technical documentations, and spoke with 23 industry experts", including former Rocket Lab engineers and executives.

41.    In particular, Bleecker Street concluded that "[r]ocket [t]ransportation [d]elays [p]ut a [l]aunch in 2026 at [b]est[,]" explaining that as part of its investigation, it "reviewed thousands of pages of technical documents and permitting information at the local, state, and federal levels.… [and that] a clear picture emerges that Rocket Lab will not be able to launch in 2025."  Bleecker Street explained that due to Neutron's size, "which is much bigger than anything currently launching from Wallops, there has been a lengthy and complex planning process about how to transport the large Neutron rocket components from where they are being constructed outside Baltimore."  The Report detailed Rocket Lab and NASA's efforts to figure out transport of Neutron's components to the Wallops launchpad, concluding that based on these findings, "Neutron's initial launch will drag well into 2026" in large part due to rocket transportation issues, among others.

42.    In its Report, Bleecker Street explained that Rocket Lab and NASA had initially settled on a direct beach landing in which sand dunes would be flattened and a temporary platform would be erected to carry Neutron components from a barge by mobile cranes, and that Rocket Lab and NASA "initially viewed a beach landing as

_____

y-this-former-kingsford-analyst-is-launching-an-activist-short-fund-short-selling-woes-be-damned).

the sole path for rocket delivery, since other infrastructure like a new bridge would require 1-2 years of additional analysis."

43.     The Report stated that Bleecker Street uncovered an initial, July 2024 joint permit application to the Virginia Marine Resource Commission ("VMRC") for three test barge landing events between September 1, 2024 and March 14, 2025, but that by October 15, 2024, in a document submission to the National Oceanic and Atmospheric Administration ("NOAA"), Rocket Lab and NASA had opened a new window for the test landings, stating in the submission that the three test events "would occur between fall of 2024 and March 14, 2025 or September 1, 2025, and March 14, 2026."

44.     The Report further explained that alternate options to transport Neutron components "are even slower[,]" pointing out that Causeway Bridge to NASA's Wallops Flight Facility was to be decommissioned and replaced, and that by November 20, 2024, based on a meeting that same day of the Accomack County (Virginia) Board of Supervisors, it appeared that a beach landing was no longer in consideration and Rocket Lab would pursue an alternate method to deliver Neutron.

45.     The Report continued that the "new option for rocket delivery appears to be dredging, which is even slower and will take years," citing a December 23, 2024, VMRC permit application to extract test samples at the Wallops NASA Ferry Dock, which would "be used for a later application to dredge the inland channel and bay for ship transit operations."  The Report further pointed out that the actual dredging application had yet to be filed, and estimated, based on an interview with a permitting consultant with relevant experience, would take an additional 12-24 months from application to completion.

46.     On this news, Rocket Lab's stock price fell $2.21, or 9.8%, to close at $20.28 per share on February 25, 2025, on unusually heavy trading volume.

47.     Yahoo! Finance reported that Rocket Lab "took a hit on Tuesday, with shares falling 10.76% to $20.07 at 10:35 AM ET after a critical short report from

Bleeker Street Research cast doubts on the company's Neutron rocket timeline."[5]  The aerospace industry also took note, with Space Insider reporting that "new analysis suggests the timeline [for Neutron's launch] is unrealistic" and that the Report "may be behind the sudden drop – 9 percent – of Rocket Lab's stock on February 25."[6]

48.    Defendants confirmed that the Neutron launch in fact would be delayed beyond mid-2025 just two days later, on February 27, 2025.  In a press release announcing Rocket Lab's 2024 annual financial results, and attached to an SEC Form 8-K filed on February 27, 2025, Defendant Beck was quoted as saying: "We rounded out the year with significant advancement across the Neutron program ahead of a *planned debut launch in the second half of 2025*."  This was the first time that Defendants stated the debut launch would occur in the second half of 2025.  The press release also listed Rocket Lab's business highlights for the year and updates since December 31, 2024, which included, in relevant part: "Shared progress on Neutron's development ahead of planned debut launch of the new reusable medium-lift rocket *in the second half of 2025*."

49.    Analysts took note of the delayed timeline.  During Rocket Lab's February 27, 2025, earnings call, Defendant Beck was asked about the timing of Neutron's first launch:

> Q: Thanks for taking our questions. One, the first one on Neutron, and to check the language around the timing, I think in the past it's been talked about as mid-2025, now you're saying second half. Is this just kind of

[5] Muslim Farooque, *Rocket Lab Sinks 10% as Short Report Raises Doubts on Neutron Rocket and Financial Health*, yahoo!finance.com, Feb. 25, 2025 (available at https://finance.yahoo.com/news/rocket-lab-sinks-10-short-160950899.html).

[6] Matt Swayne, *Rocket Lab Faces Scrutiny Over Neutron Launch Timeline and Financial Viability*, Space Insider, Feb. 27, 2025 (available at https://spaceinsider.tech/2025/02/27/rocket-lab-faces-scrutiny-over-neutron-launch-timeline-and-financial-viability/#:~:text=Bleecker%20Street%20Research%20claims%20Rocket,likely%20requiring%20additional%20capital%20raises.).

semantics, it's a couple of months, or are you trying to maybe put some cushion or take more time with any of the processes?

A - Peter Beck: Yes. Hi, Edison. We've sort of said in the past mid-2025, so, yes, we're taking a -- giving ourselves a little bit more time to get it to the pad and get the launch. But, I mean, we're talking months here, it's not – it's just not very material.

50.    Analysts were not convinced by Beck's attempt to downplay the delay. A different analyst followed up, asking Defendant Beck: "Peter, just maybe to follow-up on the Neutron question, maybe another way to ask is how confident are you in launching this year?"  Defendant Beck responded:

But I mean, look, we're not tracking any major events that would cause us to be concerned about trying to get this away this year. And always, Kevin[ph], anything that's a rocket program, I mean, we have some major tests to complete. But, at this stage, we are tracking pretty confidently to try and get this launch away.

51.    Later in the earnings call, a third analyst asked for Defendants to walk through the "things that have caused the delays" for Rocket Lab's first Neutron launch.   Defendant Beck responded that "there's no one thing," noting that the timeline is "still crazy fast compared to just about any historic rocket program[,]" but did offer that "probably the most frustrating thing is some of the large structures and third-party providers."

52.    Defendant Beck fielded another analyst question asking how achievable the new "second half of 2025" timeline for Neutron's launch was, *i.e.*, was this a "stretch goal."  Defendant Beck responded that "we just want to be as transparent as we can where we see things" and "we're trying to bring here to market and in this vehicle in such a short time frame, … but, yes, we've been transparent."

53.    Analyst reports discussed the delay.  For example, a February 27, 2025, TD Cowen report titled "Neutron Timing Slip to Weigh on Stock" commented that "Neutron launch slipped to H2:25 vs. prior indication of 'mid-2025.' … Expect stock will be soft near term, and PT is under review."

54.     Similarly, a February 28, 2025, Citizens JMP Securities report noted:

Heading into earnings, investors seemed to be becoming more anxious around the highly anticipated launch of Rocket Lab's medium-lift launch vehicle, the Neutron. At least some of those fears were realized as the company revised its estimated launch timing for *"the second half of 2025"* versus the previously stated *"mid-2025"* target. Delays aside, Founder and CEO Peter Beck reiterated the historic nature of Neutron's development/production timeline and described the shift as *"we are taking a little more time, we're talking months here. A few months here and there is really in the noise."* Mr. Beck advised there was no one single setback or failure that caused the delay and further explained management is not currently tracking any major impediments that would cause the launch to push beyond 2025 …. As explained on the earnings call (and confirmed during our conversations with management), third-party dependencies have been a major source of the delays around Neutron, although we understand those types of issues will abate after the first launch. On the positive side, management unveiled its "Return on Investment," or the ocean landing platform for Neutron return missions. (Emphasis in original).

55.     A February 28, 2025, Morgan Stanley report titled "Neutron Now Eyeing 2H25 Liftoff" observed "RKLB reported 4Q24 results slightly ahead of estimates. 1Q25 guidance, however, came in light vs. expectations while Neutron's development drives accelerated cash consumption. **Mgmt. is now targeting 2H25 for Neutron's debut launch (vs. prior mid-2025 target); we note Neutron timelines were a focus heading into the print.**" (Emphasis in original.)

56.     Rocket Lab's stock price remained below $22.49, the closing price on February 24, 2025, the day prior to Bleecker Street's release of the Report, until April 28, 2025, when the price of Rocket Lab's common stock closed at $22.67.

**D.     Following The End Of The Class Period, Defendants Further Delay Neutron's Launch**

57.     On November 10, 2025, Rocket Lab issued a press release announcing its financial results for the third quarter ended September 30, 2025.  The press release announced that the Company was "Updating our Neutron schedule that has the rocket

arriving at Rocket Lab Launch Complex 3 in Q1, 2026, with the first launch thereafter,
pending the successful completion of the vehicle's qualification testing and
acceptance program."

58.    Also on November 10, 2025, Rocket Lab held an earnings call to discuss
the Company's third quarter of 2025 financial results.  Defendant Beck's opening
remarks included a detailed explanation of Neutron's development, including that he
had spent the "recent weeks elbow-to-elbow with the teams at the various sites … for
Neutron testing" and that:

> Now with all the hardware in front of us now and significant testing
> programs underway across all parts of the vehicle, we can see we need a
> little bit more time to retire the risks and stick to the Rocket Lab process.
> Yup, it might mean things will take a little bit longer, but I want to give
> some context here. I mean, the labor cost for the program is about $15 a
> quarter, which we make back 4 times over a single launch anyway. So it
> makes zero sense to change what we know and what has proven to work.

> So we're aiming to get to Neutron to the pad in Q1 next year if all goes
> well with the first launch thereafter. Once again though, that's provided
> that myself and the team are confident we have completed Neutron's
> qual testing and acceptance testing program to the Rocket Lab standard.
> As always, this is a Rocket program, so that's been -- that has been
> completed at a pace and a cost that nobody has achieved before. And the
> financial and long-term impacts are insignificant to take a little bit more
> time to get it right.

59.    Later on the earnings call, in response to an analyst question, Defendant
Beck clarified that it was difficult to provide an estimate of when the first launch
would take place after Neutron arrives at the launch site, because Defendants planned
for further operational tests and static hot fires to take place at the launch site and
explained that they would fix any problems found prior to launch.

1

2

### E.    By The Start Of The Class Period, Defendants Knew That Rocket Transportation Issues Would Delay Neutron's Initial Launch

3    60.    On July 17, 2024, NASA submitted a permit application[7] for three barge

4    landing test events onto Wallops Island beach, within NASA's Wallops Flight

5    Facility.  In the application, NASA explained that "purpose of the project is to test

6    rocket parts delivery, rocket construction to rocket launch and recovery" for the

7    Neutron.  This application further stated that the "company [Rocket Lab] plans for

8    Neutron launches to take place from the Mid-Atlantic Regional Spaceport (MARS)

9    on the eastern coast of Virginia between September 2024 to Mid-March 2025."  This

10   permit application later described the proposed project in detail, stating that the "three

11   test events would occur between September 1, 2024, and March 14, 2025."

12   61.    On December 2, 2024, NASA submitted additional documentation in

13   support of its July 2024 permit application.[8]  Included in this documentation was an

14   October 15, 2024, letter from NASA to the U.S. Fish and Wildlife Service to request

15   an essential fish habitat consultation.  This letter copied, among others, Brian Komlos,

16   Rocket Lab's then-Director of Recovery & Marine Operations.  In the letter, NASA

17   described the project, explaining that "Rocket Lab will fund and carry out the activity

18   with authorization secured from NASA for the three barge landing test events" and

19

20   ---
[7] This permit application, numbered JPA No. 20241660, is publicly available on the
21   Virginia Marine Resources Commission website at
https://webapps.mrc.virginia.gov/public/habitat/getPDF.php?id=20241660 (last
22   visited Dec. 18, 2025).

23   [8] This additional documentation was sent to the Virginia Marine Resources
24   Commission in preparation for a hearing on the project and is publicly available on
the Virginia Marine Resources Commission website at
25   https://webapps.mrc.virginia.gov/public/habitat/getADD.php?id=226185 (last
26   visited Dec. 18, 2025).  The addition appears to have been submitted via an email
from a NASA employee on December 2, 2024.  Copied to that email was Brian
27   Komlos and Graham Schmelzer, Rocket Lab's Marine Operations & Logistics Lead
according to his public LinkedIn profile.
28

noting that "***three test events would occur between fall of 2024 and March 14, 2025 or September 1, 2025, and March 14, 2026.*** A time of year restriction (TOYR) would be enforced from March 15 to August 31 of any given year due to the presence of listed birds on the Island and in accordance with NASA's Programmatic Biological Opinion with the USFWS." Thus, as early as October 15, 2024, NASA had confirmed that these test events would be taking place during the period of the then-present through March 14, 2025, or else, well after mid-2025.

62.  By November 20, 2024, Rocket Lab and NASA seemed to have abandoned transport of Neutron's rocket components via a barge/beach landing, as detailed in the minutes to the November 20, 2024 meeting of the Accomack County Board of Supervisors.[9]  At that meeting, Jennifer Goodrum, Director of State and Local Government Operations for Rocket Lab, presented an "operational update," including the Company's efforts to bring Neutron to market.  The meeting minutes note that "[t]he challenges Rocket Lab is facing begin with transportation, a rocket that size cannot be moved by plane, train, nor automobile, it must be marine vessel." The meeting minutes further note that Ms. Goodrum explained that there was no usable location at Wallops Island for marine infrastructure, but that Rocket Lab was "***currently working with state & federal partners on ideas*** to accommodate the size of the future rockets and building infrastructure on Wallops Island[.]"

63.  This is further confirmed by CW, a Biologist at the U.S. Army Corps of Engineers since 2018.  CW worked on the barge/beach landing transportation project, which CW explained Rocket Lab pursued as an option for transferring rocket parts to Wallops Island.  CW explained that the beach landing option was subject to a different federal agency's strict seasonal timing restrictions, due to nesting shorebirds and

---

[9] These meeting minutes were publicly available on the Accomack County, Virginia website at https://www.co.accomack.va.us/government/board-of-supervisors/meeting-minutes.

nesting sea turtles, and thus vessels could not operate onshore year-round, because of the risk of crushing birds and turtles. CW explained that, from a regulatory standpoint, the beach landing could have been done, but only during limited windows and only for smaller components.

64.    CW stated that dredging was proposed as an alternative to the beach landing, and did not believe that the beach-landing alternative had ever been fully abandoned, explaining that beach landing remained an option for smaller components, but was not a viable option for transferring larger rocket components to Wallops Island.

65.    CW stated that the initial push to dredge a navigation channel in order to deliver rocket components to Wallops Island began during Thanksgiving week of 2024, when the consulting firm Stantec requested a pre-application meeting for a dredging permit on an urgent basis, emphasizing that the matter needed urgent attention. CW distinctly remembered pointing out that the request coincided with Thanksgiving week.

66.    During this initial Thanksgiving-week, pre-application meeting, in addition to CW being present, CW recalled that employees from other agencies also attended, including from the Virginia Port Authority, as well as employees from Stantec and two employees from Rocket Lab. While CW could not recall the name of the other Rocket Lab employee, one of the Rocket Lab employees present at this meeting was Brian Komlos.

67.    During this pre-application meeting, a man identifying himself as a "general" led the discussions, however CW could not recall his name or whether he worked for, or represented, Rocket Lab. At the time of this pre-application meeting, CW stated that there was no completed application submitted, only a demand from this general that the project be pushed forward immediately. CW states that the general insisted that a permit for dredging be issued by the end of the year. CW, who worked on the eventual dredging permit (*see* ¶¶72-76, *infra*), stated that the request

was "laughable," and that during this initial, pre-application meeting, it was explained to the attendees that numerous regulatory steps were required, that the U.S. Army Corps of Engineers was not the only agency involved, and that even if a complete application were to be submitted on December 1, 2024, there would still be a required twelve- to fifteen-day period to prepare and issue the public notice, followed by a mandatory, thirty-day public comment period, and thus that obtaining a permit by the end of the year "was not remotely feasible" under federal law.

68.    CW recalled that the general became visibly upset when this process was explained and repeatedly stated that the timeline was "unacceptable." CW explained that Stantec did not confront the general about these unrealistic demands, but that Stantec did fully understand the permitting process and realistic regulatory timelines and repeatedly attempted to explain those constraints during this initial, pre-application meeting.

69.    CW stated that during this meeting, the general repeatedly stated that a rocket launch was scheduled for July of 2025 and that the permit needed to be issued by year-end, in order for the parts to arrive in time for that launch. CW further recalled that the general stated that they believed they would miss the seasonal beach-landing window and did not know how else to get the components to the island, without dredging. CW explained that it was reiterated that it would not be possible to get a permit for dredging by the end of the year. CW also recalled that the general had justified the urgency of the project by citing national security and economic-development concerns.

70.    In addition to the Thanksgiving week of 2024 meeting, CW participated in multiple Zoom meetings about the dredging permit application process, including the week of Christmas, and the week after Christmas, and included participants from the Virgina Port Authority, Rocket Lab, consultants, multiple state and federal agencies, including high-level officials within the state, and that participants attended from both Virginia and California. CW stated that the general was present at every

meeting, and typically was the only person speaking forcefully. CW stated that the themes of "national security," "economic booster," and similar language were repeatedly emphasized when justifying the urgency of the project. CW stated that after the new year (*i.e.*, 2025), when project details became clearer, demands subsided and discussions moved towards realistic timelines.

71.    On December 23, 2024, Rocket Lab and the Virginia Port Authority submitted a permit to collection four geotechnical borings within a 1-mile stretch of Sloop Gut adjacent to Wallops Island.[10]  The application explained that the "intent of the project is to collect geotechnical data to analyze sediment for a future dredging project that would allow for barge access to Old North Dock. The future dredging project will be permitted under separate cover."  The application further explained that "[c]haracterizing the soil material in Sloop Gut is critical to the planning of the future dredging project."

72.    Rocket Lab did not actually apply for a dredging permit until *after* the end of the Class Period.  It was not until March 11, 2025, when Rocket Lab and the Virginia Port Authority submitted a permit application[11] to dredge a navigation channel within the Sloop Gut on the backshore side of Wallops Island.  The

---

[10] This permit application, numbered JPA No. 20242902, is publicly available on the Virginia Marine Resources Commission website at https://webapps.mrc.virginia.gov/public/habitat/getPDF.php?id=20242902 (last visited Dec. 18, 2025).  It appears to be signed by Brian Komlos, Rocket Lab's then-Director of Recovery & Marine Operations.

[11] This permit application is publicly available on the Virgina Marine Resources Commission website at https://webapps.mrc.virginia.gov/public/habitat/getADD.php?id=238238 (last visited Dec. 18, 2025).  The joint permit application explained that a permit would be sought from the U.S. Army Corps of Engineers (USACE No. NAO-2024-02948), the Virgina Marine Resources Commission (JPA No. 20250521), the Accomack County Wetlands Board, and either a permit or written exemption from the Virginia Department of Environmental Quality.

application stated that the purpose of the project was to "deliver a series of Neutron
Rocket components to their Wallops Island facility as soon as practically possible[,]"
explaining that the "dredged channel will allow for a delivery sequence of overweight
rocket components on barges and tug vessels[.]" This permit was signed, in multiple
locations, on behalf of Rocket Lab by Brian Komlos.

73.    This dredging permit application reiterated that "there is no permanent
existing means of providing safe and reliable access for large infrastructure deliveries
to Wallops Island." The application went on to further explain that "Neutron rocket
components are very large in size …, making them difficult to reasonably transport
by traditional transport methods like cargo plane, train or public roads without
extensive roadway modification[,]" that "[i]n the expected transportation
configuration, we would expect the height of a load to range 25 to 30 feet, more than
double the height and width of a standard tractor-trailer[,]" and that "[t]herefore, the
deliveries will be made by barge[.]"

74.    The dredging permit application also detailed Rocket Lab's and the
Virginia Port Authority's previous evaluation of alternative delivery methods,
confirming that transporting the Neutron rocket components by barge was the
preferred alternative, so long as adequate water depths, via dredging, could be
achieved. The dredging permit application explained that the previously pursued (and
permitted) beach landing alternative, which involved delivery of "rocket structures
directly over the Wallops Island beach by moving a barge onto the shore, constructing
a ramp on the beach, and utilizing a crane to offload cargo[,]" "is more challenging
operationally and weather limited, reducing utility for expected future higher cadence
operations. Therefore, this alternative does not meet the Project purpose and need."

75.    The dredging permit listed five other alternatives to dredging and a beach
landing, determining that dredging is the preferred method. These alternatives
included:

(i) no action, which leaves limited "available methods to get large rocket components" to the facility on a "regular basis to meet launch cadence needs and long-term launch demand[,]" "fails to address the existing and tidally limited marine access to the island, which could compromise the MARS facility's capability as a launch site for medium and large rockets with implications for launch site diversification, capacity and regional success[,]" and that these "constraints … [have] both significant economic and national security implications";

(ii) road transportation, which was "deemed infeasible given the costs, timelines required for required road modifications and potential environmental and community impacts of required modifications" of the "oversize dimensions of much of the Neutron launch vehicle components and other support equipment";

(iii) public boat ramp, *i.e.*, "unloading flight hardware at local and existing Accomack County marinas and boat ramps[,]" which "were deemed non practicable because of infrastructure limitations, required roadway modifications and logistics of access to public boat ramp facilities and community safety";

(iv) high tide offloads at Old North Dock, which the Report explained "is similar to the no action alternative and would involve utilizing the existing shallow channel, and scheduling rocket component deliveries using shallow draft vessels during high tide events[,]" and would require a number of environmental factors to align and "create logistical constraints"; and

(v) a proposed port by the Mid-Atlantic Regional Spaceport at Wallops, which is a multi-purpose project intended to enable barge access and berthing, but with "construction spanning multiple decades" and "is unfunded and has not made progress beyond the initial environmental review."

76.     The dredging permit application noted that "[g]eotechnical analysis was conducted in February 2025 to inform proper upland disposal and determine suitability of material for beneficial reuse."  This geotechnical analysis most likely relates to the Company's December 2024 permit application to collect geotechnical borings within the Sloop Gut.  And, confirming statements from CW, the dredging permit application concluded that the "ability to launch larger rockets" at NASA's Wallops facility "plays a critical role in national security redundancy and capacity." The dredging permit application cited national security concerns multiple other times and stated that the current infrastructure constraints, if not addressed (*i.e.*, by allowing dredging), would have "significant impacts to regional jobs and economic activity."

77.     While Rocket Lab received the necessary approvals, permits, and/or waivers from the Virginia Department of Environmental Quality, the Accomack County Wetlands Board, and the Virginia Marine Resources Commission, it appears that the permit has still not received the necessary federal approval from the U.S. Army Corps of Engineers.  As such, on July 3, 2025, Rocket Lab and the Virginia Port Authority submitted a permit application[12] for an alternative, temporary method, called kedging, "which will allow workboats to navigate the channel safely prior to completion of the proposed dredging project."  This kedging application explained that "[d]ue to permitting and construction mobilization timelines, the dredging project will not be completed prior to approximately five (5) rocket deliveries scheduled beginning in September 2025."  It further explained that "kedging involves steering the barge using anchors[.]"

---

[12] This permit application, numbered JPA No. 20251487, is publicly available on the Virgina Marine Resources Commission website at https://webapps.mrc.virginia.gov/public/habitat/getADD.php?id=253789 (last visited Dec. 18, 2025).

## V.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

78.    On January 9, 2025, the first day of the Class Period, Rocket Lab issued a news release announcing that it had reached a mutual agreement with NASA to include Neutron launch services through Rocket Lab's existing VADR (Venture-Class Acquisition of Dedicated and Rideshare) contract with NASA.  The January 9, 2025 news release also stated:

> Significant progress continues to be made on the rocket's launch site on Wallops Island, Virginia, with the site's completion expected in the coming months. Production, infrastructure scaling, and both Archimedes engine and full-scale components testing is continuing at pace across Rocket Lab's various production and test facilities throughout the United States. ***Neutron is scheduled for its debut launch from Rocket Lab Launch Complex 3 in Virginia from mid-2025.***

79.    On January 14, 2025, Defendant Spice participated in the 27th Annual Needham Growth Conference.  During his opening remarks at the Needham Growth Conference, Defendant Spice discussed Neutron's launch schedule, stating:

> And fortunately, we've so far been pretty good on holding the schedule. When we came public in 2021, we put an end of 2024 launch window. We since had to push that to ***the middle of 2025.***  But six months is painful.  But in the grand scheme of traditional rocket program delays, we're very much still in the sweet spot. And we're also doing it on a cost point that has never been done before.

80.    Also during the January 14, 2025 Needham Growth Conference, when discussing the Company's financials, Defendant Spice stated, in relevant part: "We'll continue to invest again aggressively.  We're not going to really get the benefit of lifting our foot off the R&D process for Neutron ***until we get that first test launch off the pad middle of this year***."

81.    On January 21, 2025, the podcast Leading Indicator released an episode entitled "Rocket Lab CEO on New Spacecraft, Trump Presidency, and Mission to

Venus" in which Defendant Beck was interviewed.[13]  As part of the January 21, 2025 podcast, at approximately 4:50 into the interview, Defendant Beck stated: "***we're looking to try and fly the, the neutron vehicle by the middle of the year*** and, you know, get that, that first successful flight.  And then the following year we'll do another three flights and then following year another five."

82.    The foregoing statements about Neutron's first launch timing as emphasized in bold italics at ¶¶78-81 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that by the time these statements were made, Defendants knew the debut launch for Neutron would be delayed until after mid-2025 due to issues with transporting Neutron's components to the launch site, including that Rocket Lab would miss the seasonal window for a barge/beach landing for smaller components and that, without an already issued permit for dredging, the Company would not be able to deliver the components in time for a mid-2025 launch.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    Defendants' Knowledge Of And Access To Information About The Transportation Issues For Delivery Of Neutron Rocket Parts

83.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt

---

[13] This podcast, along with an automatically generated transcript are available at https://www.youtube.com/watch?v=mvhF8tZitug and https://open.spotify.com/episode/3lXZgJ3mMh0Y0DCN4L1kU7 (last visited December 18, 2025).

of information reflecting the true facts regarding Rocket Lab, their control over,
and/or receipt and/or modification of Rocket Lab's allegedly materially misleading
misstatements and/or their associations with the Company which made them privy to
confidential proprietary information concerning Rocket Lab.

84.    Indeed, whereas NASA's July 2024 permit application, on behalf of
Rocket Lab, stated that the three barge landing test events would occur between
September 1, 2024, and March 14, 2025 in order for Rocket Lab's planned "Neutron
launches to take place … between September 2024 to Mid-March 2025," by mid-
October, as documented in NASA's October 15, 2024 letter, which was submitted as
additional documentation for the permit application, and which explicitly stated that
"Rocket Lab will fund and carry out the activity with authorization secured from
NASA," stated that these three test events would occur between fall of 2024 and
March 14, 2025 or **September 1, 2025, and March 14, 2026**, and dropped any mention
of when the launches were expected to occur.  This October 15, 2024 letter suggests
that NASA and Defendants knew that barge landing test events as part of the Neutron
development process likely would not occur until after September 1, 2025 (*i.e.*, well
after "mid-" 2025).  This delay in the transportation timeline is supported by Rocket
Lab's later statements on November 20, 2024, to the Accomack County Board of
Supervisors, where the Company admitted it was facing transportation challenges and
that they were "currently working" on ideas to accommodate the size of the rocket—
suggesting that Rocket Lab was not sure if the barge landing events would occur.

85.    However, by the week of Thanksgiving 2024, it was admitted during a
meeting with Rocket Lab, its consultant, and several governmental agencies that they
would not make the seasonal window for the beach landing, and thus, if they did not
receive permits for the newly chosen preferred transportation alternative of dredging
prior to the end of 2024, they would not make the July 2025 rocket launch schedule.
Defendants were told at this same meeting, that they would not receive the necessary
permits by the end-of-year deadline.  Indeed, Defendants only applied for a permit to

1   take samples of the area they intended to dredge as of December 23, 2024, and did

2   not even apply for a permit to dredge until March 11, 2025.

3        86.    Moreover, Defendant Beck's public statements demonstrated that he was

4   a highly sophisticated individual and in a position to know that his statements were

5   materially false and misleading during the Class Period.  Just prior to, and during the

6   Class Period, Defendant Beck appeared in a series of podcast interviews.  Defendant

7   Beck's statements during these podcast interviews demonstrated how hands-on and

8   how intimately involved he was in Neutron's development.  For example, in these

9   interviews, Defendant Beck frequently talked about how his "paranoia" of failure

10  ensured that he was involved in everything.  On a December 16, 2024 interview with

11  Cheddar, Defendant Beck stated: "I think in this industry *you have to be paranoid*

12  *about failure*, [] because it's like everything's either perfect [] or [] it's international

13  news [] so that there is no [] middle kind of outcome here, [] and [] as a result [] *you*

14  *just have to be over everything all of the time*."[14]  Similarly, in an interview with

15  SpaceNews on January 23, 2025, when asked what gets him up in the morning,

16  Defendant Beck responded, "I have an innate interest in space, but I think [] probably

17  the fear of failure is [] the [] probably one of the driving forces [], and [] to be

18  successful in this industry you need to be somewhat paranoid [] and always thing of

19  [] potential failure vectors, so [] it's clearly something I'm passionate about[.]"[15]  And

---

22  [14] This podcast interview, titled *How Rocket Lab CEO Sir Peter Beck Launched A
23  $12B Rocket Company*, is available at
    https://www.youtube.com/watch?v=iE8756WzLP8 (last visited Dec. 18, 2025).
24  This statement was made at approximately 14:12.  Filler words have been omitted
25  from the quotation.

26  [15] This podcast interview, titled *Space Minds with Peter Beck*, is available at
    https://www.youtube.com/watch?v=OVmkGZ4fSTA (last visited Dec. 18, 2025).
27  This statement was made at approximately 3:12.  Filler words have been omitted
28  from the quotation.

1  during the February 1, 2025, Dom Harvey interview, when asked to describe himself,

2  Defendant Beck said "I care a lot [], so paranoid is the right word."[16]

3      87.    Similarly, Defendant Beck also admitted that he was a micromanager.

4  For example, on a January 16, 2025, interview with Holiday Breakfast Newstalk ZB,

5  the interviewer asked, "I've seen some descriptions of your [] own superpowers, if

6  we can use that word, three things popped out, I think: micromanaging, workaholism,

7  and paranoia."  Defendant Beck responded, in a joking manner, "don't sound great do

8  they, I wish I never said that now ...."[17]  He later clarified that micromanaging means

9  more "down in the weeds, [] when needed. So if there is [] a particular problem, you

10 know, some people's management style is I've got people for that and they'd sort it

11 out.  My management style is if I think I can be useful, I'm down there and down

12 there as deep as a wrench. So that's probably what I mean."[18]  And, on the Dom

13 Harvey interview, Defendant Beck was asked, "If staff were to pick on your worst

14 flaw what do you think they'd say?"  He responded, "I'm probably too intense, [] ***I***

15 ***micromanage, [], I get down into the details***[.]"[19]  Later in the interview he was asked

16 what frustrates him, to which Defendant Beck responded, "I have a sense of urgency,

17

18

---

19 [16] This statement was made at approximately 18:02.  Filler words have been omitted
20 from the quotation.

21 [17] This podcast interview, titled This podcast interview, titled *How Rocket Lab CEO*
22 *Sir Peter Beck Launched A $12B Rocket Company*, is available at
23 https://www.newstalkzb.co.nz/on-air/holiday-breakfast/audio/sir-peter-beck-rocket-
   lab-founder-on-the-strength-of-the-company-his-career-history/ (last visited Dec. 18,
24 2025).  This statement was made at approximately 7:05.  Filler words have been
   omitted from the quotation.

25 [18] This statement was made at approximately 8:52.  Filler words have been omitted
26 from the quotation.

27 [19] This statement was made at approximately 1:26:56.  Filler words have been omitted
28 from the quotation.

---

so when [] things are too slow, … when things are just very, very too slow, [] that's incredibly frustrating[.]"[20]

**B.    Defendants Admitted That Neutron Was Material Significant To The Company And Were Motivated To Delay The Announcement Of The Launch Delay**

88.    Despite knowing by the start of the Class Period that the mid-2025 launch date was not realistic or attainable, Defendants did not want to publicly push out the launch date again.  As Defendant Spice admitted, Rocket Lab's earlier-announced (in May 2024) delay of Neutron's launch to mid-2025 was "painful."  And the launch of Neutron was of huge importance to the Company and investors. Defendant Beck called 2025 the "year of Neutron" and explained that the first launch of Neutron "is so important for us because that really has such a tremendous impact on the P&L[.]"   During the January 14, 2025 Needham Growth Conference, Defendant Spice stated that the Neutron is a "huge enabler on a few fronts," citing commercial (*i.e.*, paid) Neutron launches as the path to "very healthy margins," that commercial launches will "create[] a big inflection point for our P&L," and that they will be a financial milestone for the Company, including actual commercial opportunities Rocket Lab did have for Neutron.

89.    Defendants were also motivated to not publicly push out Neutron's initial launch date in order to raise equity for the Company and to fund Rocket Lab's strategic acquisitions.  Indeed, just two weeks after Bleecker Street issued its Report, on March 11, 2025, Rocket Lab made two announcements: (1) that it filed a prospectus supplement with the SEC on Form 424B5 for a $500 million, "at the market" ("ATM") equity offering program; and (2) that it had entered into a non-binding term sheet with certain lenders to acquire a controlling equity position in Mynaric AG for $75 million payable in cash or shares of common stock of Rocket

---

[20] This statement was made at approximately 1:28:00.  Filler words have been omitted from the quotation.

Lab.  Mynaric, which was already a supplier to Rocket Lab, produces laser optical communications terminals for air, space, and mobile applications.

90.    Under the ATM offering, Rocket Lab offers and sells shares of its common stock at then-current market prices.  Thus, the higher Rocket Lab's share price, the fewer shares it would have to sell to raise $500 million, and the less dilutive the offering would be to existing shareholders,[21] including the Individual Defendants, each of whom were current shareholders.  Rocket Lab stated in its March 11, 2025 announcement that it planned to use the net proceeds from the ATM offering to "fund future growth, including potential future acquisitions such as Rocket Lab's intent to acquire laser communications provider Mynaric, announced today, and for general corporate and working capital purposes."

91.    On May 27, 2025, Rocket Lab announced that it had entered into the satellite payload market with its acquisition of Geost, an "electro-optical and infrared (EO/IR) payload development and manufacturing company and provider to high-priority national security satellites."  Rocket Lab stated that they agreed to acquire Geost for $275 million, $125 million in cash and $150 million in privately placed shares of Rocket Lab common stock, plus up to $50 million in potential additional cash earnout payments tied to revenue targets.  Like the ATM offering, the higher Rocket Lab's share price, the fewer shares the Company would need to issue to close either acquisition.

92.    Defendants terminated the $500 million ATM offering, in favor of a newly announced ATM offering of up to $750 million, on September 15, 2025.  Prior

---

[21] In its prospectus supplement, Rocket Lab stated that, based on the last reported sale price of its common stock price on the NASDAQ on March 10, 2025, of $17.12 per share of common stock, the Company would need to issue and sell 29,205,607 shares to raise $500 million.  By comparison, at the closing price of $22.49 on February 24, 2025, the date immediately preceding the Bleecker Street Report, Rocket Lab would have needed to issue and sell approximately 22,232,103 shares.

to terminating the $500 million ATM offering, Rocket Lab raised $396.6 million in
gross proceeds.  The Company stated it would use the proceeds "to fund future
growth, including potential future acquisitions, and for general corporate and working
capital purposes[,]" as well as for the cash portion of the potential Mynaric acquisition
if it is completed.

**C.    Corporate Scienter Allegations**

93.    The Company is liable for the acts of Defendants Beck and Spice and its
other employees and agents under the doctrine of *respondeat superior* and common
law principles of agency because all of the wrongful acts complained of herein were
carried out within the scope of their employment and/or agency.

94.    The scienter of Defendants Beck and Spice and other employees and
agents of the Company is similarly imputed to the Company under the corporate
scienter doctrine, *respondeat superior*, and agency principles.

95.    Aside from the scienter of Defendants Beck and Spice, the facts alleged
herein raise a strong inference of corporate scienter as to Rocket Lab as an entity.
Corporate scienter may be alleged independent of individual defendants where a
statement is made or approved by a corporate official sufficiently knowledgeable
about the company to know the statement was false or misleading.  Here, the
statements alleged were made to the investing public regarding the Company's
operations, finances, and business practices—all important topics that would
necessarily require approval by appropriate corporate officers.

**VII.  LOSS CAUSATION**

96.    The market for Rocket Lab's common stock was open, well-developed,
and efficient at all relevant times.  During the Class Period, as detailed herein,
Defendants made false and misleading statements and omissions that artificially
inflated the price of Rocket Lab's publicly-traded common stock.  The price of the
Company's shares of common stock significantly declined when the
misrepresentations made to the market, and/or the information alleged herein to have

been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

97.    During the Class Period, Plaintiffs and members of the Class purchased publicly traded shares of Rocket Lab common stock at artificially inflated prices and were damaged thereby.    Accordingly, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

98.    Artificial inflation in Rocket Lab's stock price was removed when concealed risks partially materialized and/or the truth about the material misrepresentations and omissions was revealed to the public on February 25, 2025. As a direct result of these partial disclosures, the price of Rocket Lab's publicly traded shares of common stock declined precipitously on heavy trading volume, causing economic injury to Plaintiffs and other members of the Class.

99.    On February 25, 2025, at approximately 10 AM EST, Bleecker Street Research published a report entitled "Rocket Lab (RKLB): We Think It's Gonna Be a Long, Long Time."  The Report stated, among other things, that Rocket Lab "has materially misled investors about the likelihood that its Neutron rocket will launch in mid-2025" and that "[m]any aspects of RKLB's Neutron program remain far behind where they need to be[,]" including that, based on Bleecker Street's review of "technical documents and permitting information[,]" it was clear that "[r]ocket [t]ransportation [d]elays [p]ut a [l]aunch in 2026 at [b]est[.]"

100.    Following this news, the price of Rocket Lab's common stock fell 9.83%, or $2.21 per share, from a closing price of $22.49 on February 24, 2025 to close at $20.28 per share on February 25, 2025, on unusually heavy trading volume.

101.    The Report's conclusion that the launch of Neutron would be delayed beyond mid-2025 was subsequently partially confirmed by Defendants' February 27, 2025, announcement that the launch was now anticipated to occur in the second half of 2025 (as opposed to mid-2025), and again by Defendants' November 10, 2025,

1  announcement updating Neutron's launch schedule to have the rocket arriving at
2  Wallops Flight Facility launchpad in the first quarter of 2026, and the initial launch
3  sometime thereafter depending on "successful completion of the vehicle's
4  qualification testing and acceptance program."

5  **VIII.  CLASS ACTION ALLEGATIONS**

6          102.   Plaintiffs bring this action as a class action pursuant to Federal Rule of
7  Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and
8  entities that purchased the publicly traded common stock of Rocket Lab between
9  January 9, 2025 and February 25, 2025, inclusive, and who suffered economic losses
10 as a proximate result of the alleged wrongdoing (the "Class").  Excluded from the
11 Class are: (a) persons and entities that suffered no compensable losses; and (b)(i)
12 Defendants; (ii) present and former parents, subsidiaries, assigns, successors,
13 predecessors and affiliates of Rocket Lab or Defendants, as applicable; (iii) any
14 person who served as an officer and/or director of Rocket Lab during the Class Period
15 and their Immediate Family Members; (iv) any entity in which the Defendants have
16 or had a controlling interest, including, but not limited to, family foundations; (v) any
17 trust of which a Defendant is the settler or which is for the benefit of a Defendant
18 and/or their Immediate Family Members; (vi) Defendants' D&O liability insurance
19 carriers; and (vii) the legal representatives, heirs, successors, and assigns of any
20 person or entity excluded under provisions (i) through (vi) hereof.  For the avoidance
21 of doubt: (a) "affiliates" are persons and entities that directly or indirectly through one
22 or more intermediaries, control, are controlled by, or are under common control with
23 one of the Defendants; and (b) "Immediate Family Members" are children,
24 stepchildren, parents, stepparents, spouses, siblings, mothers-in-law, fathers-in-law,
25 sons-in-law, daughters-in-law, brothers-in-law, and sisters-in-law; with "spouse"
26 meaning a husband, a wife, or a partner in a state-recognized domestic relationship or
27 civil union.

28

SECOND AMENDED CLASS ACTION COMPLAINT
36

103.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Rocket Lab's shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Over 593 million shares of Rocket Lab common stock were traded publicly during the Class Period on the NASDAQ.  As of February 21, 2025, Rocket Lab had 453,545,095 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Rocket Lab or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

104.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

105.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

106.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    whether statements made and disseminated by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Rocket Lab;

c.    whether Defendants knew or deliberately disregarded that their statements were false and misleading;

d.    whether the price of shares of Rocket Lab common stock was

artificially inflated because of Defendants' conduct complaint of herein; and

e.    what extent the members of the Class have sustained damages and the proper measure of damages.

107.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

108.    The market for Rocket Lab's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, the shares of Rocket Lab's common stock traded at artificially inflated prices during the Class Period.  On January 23, 2025, the Company's share price closed at a Class Period high of $31.57 per share, and the following day, January 24, 2025, the Company's share price hit an intraday Class Period high of $33.34 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired shares of Rocket Lab's common stock relying upon the integrity of the market price of the shares of the Company's common stock and market information relating to Rocket Lab and have been damaged thereby.

109.    During the Class Period, the artificial inflation of Rocket Lab's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements and omissions about Rocket Lab's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Rocket Lab and its

business, operations, and prospects, thus causing the price of the Company's shares of common stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements and omissions during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

110.   At all relevant times, the market for Rocket Lab's common stock was an efficient market for the following reasons, among others:

a.     Rocket Lab shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.     As a regulated issuer, Rocket Lab filed periodic public reports with the SEC and/or the NASDAQ;

c.     Rocket Lab regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, and by directly emailing its financials to investors who requested such alerts on Rocket Lab's website; and/or

d.     Rocket Lab was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and/or

e.     The average daily trading volume for Rocket Lab's common stock during the Class Period was approximately 20.07 million shares with 453,545,095 shares of common stock outstanding as of February 21, 2025 and a market capitalization high reaching over $15.782 billion during the Class Period on January 23, 2025.  On February 25, 2025, following the release of the Bleecker Street Report,

the market capitalization fell to $11.17 billion—a more than $4 billion drop from the Class Period high just one month earlier.

111.    As a result of the foregoing, the market for Rocket Lab's common stock promptly digested current information regarding Rocket Lab from all publicly available sources and reflected such information in Rocket Lab's share price.  Under these circumstances, all purchasers of Rocket Lab's common stock during the Class Period suffered similar injury through their purchase of shares of Rocket Lab's common stock at artificially inflated prices and a presumption of reliance applies.

112.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

113.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

114.    The statements and omissions alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful

cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

115. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Rocket Lab who knew that the statement was false when made.

## XI.    CLAIMS FOR RELIEF

**COUNT I**
**Violation of Section 10(b) of The Exchange Act**
**And Rule 10b-5 Promulgated Thereunder**
**<u>Against All Defendants</u>**

116. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

117. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Rocket Lab's shares of common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

118. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and/or (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Rocket Lab's common stock in violation of Section 10(b) of the

Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

119. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Rocket Lab's financial well-being and prospects, as specified herein.

120. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Rocket Lab's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Rocket Lab and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

121. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other

members of the Company's management team, internal reports and other data and
information about the Company's finances, operations, and sales at all relevant times;
and (iv) each of these defendants was aware of the Company's dissemination of
information to the investing public which they knew and/or recklessly disregarded
was materially false and misleading.

122.   Defendants had actual knowledge of the misrepresentations and/or
omissions of material facts set forth herein, or acted with reckless disregard for the
truth in that they failed to ascertain and to disclose such facts, even though such facts
were available to them. Such defendants' material misrepresentations and/or
omissions were done knowingly or recklessly and for the purpose and effect of
concealing Rocket Lab's financial well-being and prospects from the investing public
and supporting the artificially inflated price of its common stock.  As demonstrated
by Defendants' misrepresentations and/or omissions of the Company's business,
operations, financial well-being, and prospects throughout the Class Period,
Defendants, if they did not have actual knowledge of the misrepresentations and/or
omissions alleged, were reckless in failing to obtain such knowledge by deliberately
refraining from taking those steps necessary to discover whether those statements
were false or misleading.

123.   As a result of the dissemination of the materially false and/or misleading
information and/or failure to disclose material facts, as set forth above, the market
price of Rocket Lab's common stock was artificially inflated during the Class Period.
In ignorance of the fact that market prices of the Company's common stock were
artificially inflated, and relying directly or indirectly on the false and misleading
statements made by Defendants, or upon the integrity of the market in which the
securities trades, and/or in the absence of material adverse information that was
known to or recklessly disregarded by Defendants, but not disclosed in public
statements by Defendants during the Class Period, Plaintiffs and the other members

of the Class acquired Rocket Lab's common stock during the Class Period at artificially high prices and were damaged thereby.

124.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Rocket Lab was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Rocket Lab common stock, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

125.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

126.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

### COUNT II
### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

127.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

128.    Individual Defendants acted as controlling persons of Rocket Lab within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company,

including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

129.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

130.    As set forth above, Rocket Lab and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

131.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

# XIII.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  December 19, 2025

**GLANCY PRONGAY & MURRAY LLP**

By:    */s/ Leanne H. Solish*

Robert V. Prongay
Leanne H. Solish
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  info@glancylaw.com

*Counsel for Plaintiffs and Lead Counsel*

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.   On December 19, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.   Executed on December 19, 2025, at Los Angeles, California.

*/s/ Leanne H. Solish*
Leanne H. Solish