UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 25-1733-GW-KESx | Date | April 14, 2026 |
| Title | *Douglas Bray v. Rocket Lab USA, Inc., et al.* | | |

| | | |
|---|---|---|
| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs: None Present

Attorneys Present for Defendants: None Present

**PROCEEDINGS: IN CHAMBERS - TENTATIVE RULING ON DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT [82]**

Attached hereto is the Court's Tentative Ruling on Defendants' Motion [82] set for hearing on April 16, 2026 at 8:30 a.m.

: 

Initials of Preparer JG

***Bray v. Rocket Lab USA, Inc., et al.***, Case No. 2:25-cv-1733-GW-(KESx)
Tentative Ruling on Motion to Dismiss Second Amended Class Action Complaint

On November 10, 2025, the Court granted an earlier motion to dismiss in this securities fraud action (with leave to amend) based on deficiencies in the scienter allegations (without ruling out that there were additional deficiencies in other required elements). *See* Docket Nos. 79-80. Subsequently, on December 19, 2025, plaintiff Douglas Bray ("Plaintiff")[1] filed his Second Amended Class Action Complaint for Violations of the Federal Securities Laws ("SAC"). *See* Docket No. 81. Defendants Rocket Lab USA, Inc. ("Rocket Lab"), Peter Beck ("Beck") and Adam Spice ("Spice," together with Beck, "the Individual Defendants," and the Individual Defendants together with Rocket Lab, "Defendants") have again filed a Rule 12(b)(6)-based motion to dismiss. Defendants' motion again challenges Plaintiff's ability to successfully plead the required elements of falsity, scienter and loss causation. *See In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024) (setting forth the elements for Section 10(b) and Rule 10b-5(b) claims).

Scienter[2]

Noting that the SAC continues to lack any motive or "unique benefit" to the Individual Defendants from the scheme Plaintiff believes he has identified, in their opening brief Defendants summarize Plaintiff's scienter allegations as being reliant upon the theory that:

> (i) "paid" commercial launches of Neutron "will create a big inflection point" for Rocket Lab's profitability; and (ii) an inflated stock price would purportedly help support an at-the-market ("ATM") offering and corporate acquisition that Rocket Lab announced two months later in mid-March (two weeks after the end of the class period), and a separate acquisition announced four months later in late May (a full three months after the class period ended).

Docket No. 82, at 13:17-22 (emphasis in original) (citing/quoting SAC ¶¶ 88-91). After

[1] The operative pleading refers to Willie Croskrey as the "Lead Plaintiff" and to Douglas Bray as simply a "plaintiff." *See* SAC ¶ 21-22. However, to accord with the caption of the action, the Court refers to Bray as "Plaintiff" herein.

[2] The Court set forth the principles underlying the scienter requirements subsequent to enactment of the Private Securities Litigation Reform Act in its prior order, and the parties' familiarity with that discussion, and those principles, is presumed such that it will not be repeated herein.

again noting that a lack of motive is not *fatal* to a sufficient scienter allegation, Plaintiff acknowledges that these allegations *are* his "short-term [profit] motive" allegations. Docket No. 87, at 17:21-26; *see also* SAC ¶ 13. He cites evidence – or at least allegations – that Neutron's launch timeline "was a huge driver of Rocket Lab's stock price." Docket No. 87, at 18:1-6. He also believes that, although the ATM offering and acquisition were announced two weeks after the class period ended on February 25, 2025, *see* SAC ¶¶ 1, 89-91, "[t]he far more plausible inference is that Defendants had been working to finalize both throughout the Class Period." Docket No. 87, at 18:10-11. But he identifies no factual allegations in that regard, let alone any that suggest there was a connection between statements made about Neutron's timeline and those future corporate transactions.

The scienter requirement obligates securities fraud plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). There is no "strong inference" based on facts connecting the ATM and acquisition to the allegedly actionable statements in this case. Instead, Plaintiff wants the Court to take a leap across a chasm, not what the Private Securities Litigation Reform Act ("PSLRA") has in mind. As the Court explained in its prior dismissal order, under the PSLRA it is simply not the case that all *scienter* inferences are necessarily drawn in favor of the plaintiff.

The Court reaches the same conclusion as Defendants: even ignoring Plaintiff's failure to connect the future, post-class period, ATM offering and acquisition with the statements made leading up to and during the class period, these – and the basic interest in "driv[ing]" one's stock price – are "routine corporate objectives." As the Court has previously explained in this case, "allegations of routine corporate objectives . . . are not, without more, sufficient to allege scienter," because otherwise a finding of scienter would exist "for any company that seeks to enhance its business prospects." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012); *see also Espy v. J2 Global, Inc.*, 99 F.4th 527, 536 (9th Cir. 2024) ("'Deliberate recklessness is a higher standard than mere recklessness and requires more than a motive to commit fraud.'") (quoting *Glazer Cap. Mgmt., L.P. v. Forescout Techs. Inc.*, 63 F.4th 747, 764 (9th Cir. 2023)); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) ("If scienter could be

pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'") (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)). As Defendants note in their motion, *see* Docket No. 82, at 14:26-15:21, this would not be the only court to reject reliance on an upcoming ATM offering (or similar upcoming corporate transactions) as a basis to surpass the PSLRA's scienter hurdle.

Again, where a plausible motive allegation is missing a complaint must "otherwise assert[] compelling and particularized facts showing fraudulent intent or deliberate recklessness." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021). Are there *compelling* and *particularized* facts alleged that amount to that state-of-mind here? In the Court's view, the answer is "no," leading the Court once again to the conclusion that Plaintiff is left with a theory of fraud that simply does not make much sense. *See* Docket No. 79, at pg. 6 of 11; *see also Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020).

Beyond his motive-deficient allegations – in addition to repeating in the SAC information that the Court already addressed and found deficient in its earlier dismissal order, *see, e.g.*, SAC ¶¶ 8, 13, 51, 84, 88 – Defendants identify Plaintiff's reliance on a meeting during the week of Thanksgiving 2024 and what he says "was admitted" during that meeting about Rocket Lab's inability to test a "beach landing" until September 2025 and its inability to timely obtain dredging permits to use dredging to meet a mid-2025 test-launch date for Neutron. *See id.* ¶¶ 65-68. As Defendants observe, there is no indication in the SAC that either of the Individual Defendants attended that meeting, and Plaintiff himself has acknowledged that there were numerous ways, other than a beach landing and dredging, of delivering Neutron parts to Wallops Island. *See id.* ¶¶ 9, 11, 44, 74-75, 84.

Relying on *In re ChinaCast Education Corp. Securities Litigation*, 809 F.3d 471 (9th Cir. 2015), where the Ninth Circuit allowed imputation of the scienter of a company's founder/CEO and CFO to the company itself, Plaintiff's response is that information known to agents is deemed known by principals, without specifying who the agent was at the Thanksgiving 2024 meeting. As to the Individual Defendants

themselves, despite their non-attendance at that meeting, Plaintiff believes that all he has to allege is that the Individual Defendants had *access* to information that contradicted their public statements. In demonstrating such access, he argues that a Court can consider the Individual Defendants' positions and "detail-oriented nature."[3] In that regard, Plaintiff points to paragraphs 86 and 87 with respect to Beck, and paragraphs 79, 80, and 88 for Spice. *See also* SAC ¶¶ 28, 83. He argues that "[t]he more plausible inference" is that "they were informed by their senior executive in attendance at the Thanksgiving-week meeting" – not identifying who that "senior executive in attendance" was – "that receiving a permit in time for the mid-2025 launch 'was not remotely feasible.'" Docket No. 87, at 14:7-10.

With respect to confidential-witness ("CW") allegations, Defendants point out that Plaintiff removed from the SAC allegations about three CWs that had been present in the prior version of the complaint, and added allegations about one CW who did not work at Rocket Lab and who – at least as the SAC reveals – had no interactions with the Individual Defendants at all. *See Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1134 (9th Cir. 2025) (concluding that confidential witness statements did not show scienter because "few witnesses had the required personal knowledge of [company's Chief Executive and Chief Medical Officers'] decision-making . . . , as most witnesses never interacted with either executive"); *Police Ret. Sys. Of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) ("Missing are allegations linking specific reports and their contents to the executives, not to mention the link between the witnesses and the executives."). Plaintiff's only response on this point is that he has described the CW sufficiently and that the CW can attest to what occurred at the Thanksgiving 2024 meeting. That the CW had no interaction with either of the Individual Defendants is unimportant, in Plaintiff's telling, so long as there is still a strong inference of scienter based upon "a holistic evaluation of the allegations." Docket No. 87, at 15:25-16:7. And, according to Plaintiff, the CW's account "establishes that [the six alternatives to a beach landing and dredging]

[3] Defendants note that the actual words spoken by Beck in podcast interviews (as to which Plaintiff does not contest the Court's ability to take judicial notice) do not support the allegation, in paragraph 86 of the SA, that Beck was "hands-on" or "intimately involved . . . in Neutron's development." *See* Docket No. 82, at 17:20-26. Plaintiff does not respond to this point in his Opposition, in effect conceding that Defendants are correct.

were not in consideration at the time," citing paragraph 69 of the SAC. *Id.* at 16:13-15.

However, paragraph 69 does not say that. Instead, it says that an unidentified "general" indicated that a permit for dredging "needed to be issued by year-end, in order for the parts to arrive in time for [a July 2025] launch" and that the general also stated that "they believed they would miss the seasonal beach-landing window and did not know how else to get the components to the island, without dredging." SAC ¶ 69. There is no explanation of the connection between the "general" and Rocket Lab. Nor is there any indication that anyone *from Rocket Lab* indicated, or agreed, that alternatives to a beach landing/dredging operation were "not in consideration at the time" or that *Rocket Lab* "did not know how else to get the components to the island, without dredging."

Even assuming that the Court were to ignore the Individual Defendants' non-attendance at the Thanksgiving 2024 meeting, and were to fully credit either or both of Plaintiff's "agent" and/or "access" theories[4] for attributing knowledge about that meeting to the Individual Defendants, how is the Court to ignore the existence of alternatives to a beach landing and dredging that Plaintiff concedes existed? *See id.* ¶¶ 9, 11, 44, 74-75, 84. Indeed, the SAC cites a March 11, 2025 dredging permit application that "detailed Rocket Lab's and the Virginia Port Authority's *previous* evaluation of alternative delivery methods," explaining that barge transportation was simply "the *preferred* alternative." *Id.* ¶¶ 72, 74 (emphases added). The Court has to be able to conclude that the Defendants had a *fraudulent intent* or were *deliberately reckless*. *See SEC v. Rubera*, 350 F.3d 1084, 1094 (9th Cir. 2003); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 974, 979 (9th Cir.), *reh'g & reh'g en banc denied*, 195 F.3d 521 (1999). When there were other possible solutions to the problems posed for readiness for a mid-2025 launch, how do we get there just because the Defendants were – under Plaintiff's theory/theories – aware that two possible solutions clearly were not going to work with their timeline?

Plaintiff believes that an inference about the possibilities posed by the alternatives to a beach landing or dredging is "not logical, let alone compelling," because "it was admitted" during the Thanksgiving 2024 meeting that Rocket Lab "did not know how

[4] With respect to the "access" theory, the Court sees little reason to disagree with Defendants' statement in their Reply that "[i]f mere *ability* to access allegedly contradictory information was sufficient, scienter would be established in every case for high-ranking executives because they always have the *ability* to access company data." Docket No. 93, at 15:12-14.

else" to transport Neutron components without dredging, *see* SAC ¶¶ 10, 85, and because the March 2025 permit application – an application that was submitted *after* the close of the class period, *see id.* ¶ 11 – identified drawbacks of the five alternatives identified therein. Plaintiff's use of the passive voice in the phrase "it was admitted" does not reflect whom, if anyone, actually "admitted" these points. As Defendants point out in their Reply, it appears that *no one associated with Rocket Lab* "admitted" that the company did not know how else to transport components without dredging. Again, paragraph 69 of the SAC, which Plaintiff relies upon in his Opposition, refers to a "general," but Plaintiff admits that he does not know the "general's" name "or whether he worked for, or represented, Rocket Lab." *Id.* ¶¶ 67, 69. Moreover, an admission of *complicating* considerations *after* the close of the class period, even ignoring that timing issue, does not mean that alternative options were impossible or so implausible that one would have to be "deliberately reckless" to conclude that they might work (which, again, is all for the goal of meeting a general launch-timeline instead of suffering a few-month delay[5]).

Beyond these points, Plaintiff again attempts to rely on the "core operations" inference with respect to Neutron, citing to cases that he says support a conclusion that allegations relating to a company's projects or products like Neutron were sufficient to call into play that inference. Defendants assert in their Reply that the Court can ignore any attempt by Plaintiff, in his Opposition, to discuss a "core operations" theory, because, they assert, it was not pled in Plaintiff's SAC. It is true that the phrase "core operations" does not appear in the SAC, but the Court does not necessarily agree that there is not at least a hint that Plaintiff intended to make use of that theory. In any event, for the reasons the Court explained in its prior dismissal order, "it would seem to be a stretch to call Rocket Lab's plans for launching Neutron the company's 'core operations,' unless one were to consider *everything* that Rocket Lab does its core operations." Docket No. 79, at pgs. 8-9 of 11. The Court would take the same view again here given the length and success of Rocket Lab's operation and its only-recent emphasis on Neutron. *See*

[5] The Court does not see any indication in the SAC that a few-month delay in launch of the Neutron threatened the ability to achieve any of the goals or potential contracts that were reliant on a successful Neutron product. *See* SAC ¶¶ 38-39.

SAC ¶¶ 29-38, 88. Moreover, in any event, under the core operations doctrine, "'reporting false information will only be indicative of scienter where the falsity is patently obvious.'" *Sneed*, 147 F.4th at 1134 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009)). When dealing with a prediction of a launch schedule for a ground-breaking rocket, it would be difficult to imagine a "patently obvious falsity." The Court easily concludes that no such falsity is present here.

Finally, as to Plaintiff's attempt to rely on "corporate scienter" (where scienter is imputed to a company based on the knowledge of *any* employee), Defendants note that the Ninth Circuit has not (yet, at least) adopted that doctrine because of its inconsistency with the PSLRA's pleading requirements. *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743-45 (9th Cir. 2008); *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014). Despite raising the theory in the SAC, *see* SAC ¶¶ 93-95, Plaintiff does not appear to attempt to address this issue in his Opposition,[6] so the Court considers it no further here.

It is true that the question "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." 551 U.S. at 322-23 (emphasis in original); *see also In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012); *Zucco Partners*, 552 F.3d at 992. Whether viewed individually or holistically, Defendants argue the scienter allegations come up short. Once again, the Court agrees.

In determining whether a "strong" inference of scienter exists, "the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). The inference of scienter must be more than merely "reasonable" or "permissible" – "it must be cogent and compelling," and "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324; *see also id.* at 314, 328. It is at least an equally-compelling inference that, at the time the statements in question were made between January 9 and January 21, 2025, *see* SAC ¶¶ 78-81, Defendants had sincere hopes that their expressed timeline would be achievable, while also knowing that meeting that timeline would not be without challenges related to

[6] Defendants make the same point about a "collective scienter" theory in their Reply. *See* Docket No. 93, at 16 n.10.

the ability to transport parts to Wallops Island in a timely manner. *See also* Docket No. 79, at pgs. 10-11 of 11 ("Without a short-term profit motive, the Court agrees with Defendants that a fraud theory that is reliant on tricking the public into thinking that an event will occur a few months earlier than it apparently will does not make a lot of sense, *i.e.* is *at best* questionably 'cogent,' and nowhere near as 'compelling' as Defendants' alternative explanation.").[7] The Court believes that this is even more an appropriate conclusion here because "[s]howing scienter necessarily becomes harder when the allegedly misleading statements are not flagrantly false because in those cases an innocent alternative explanation becomes more likely." *Sneed*, 147 F.4th at 1134. Plaintiff has not come close to demonstrating statements about the launch schedule for the Neutron were "flagrantly false."

Plaintiff has already amended his allegations twice (though only once in response to a successful dismissal motion), and the Court has already specifically provided Plaintiff an amendment opportunity to get his scienter allegations across the line set by the PSLRA. As explained, he has not done so successfully. Under that setting, another opportunity for amendment is not mandated (and Plaintiff has not given any indication in his papers about anything that he now knows he could add, let alone in a way that might conceivably make a difference to the Court's analysis). *See Zucco Partners*, 552 F.3d at 1007 ("[W]here the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, '[t]he district court's discretion to deny leave to amend is particularly broad.'"); *see also Espy*, 99 F.4th at 542 ("[V]ague promise[s] of 'additional information' cannot cure the deficiencies in the complaint."). As such, Plaintiff's failure on this element is enough, by itself, to warrant dismissal without leave to amend. However, the Court will also briefly discuss the issue of loss causation, another element that Plaintiff falls short on here.

Loss Causation

"A private plaintiff who claims securities fraud must prove that the defendant's

---

[7] Defendants state the premise perhaps better than the Court has here: "Given the obvious complexity in creating a reusable rocket, everyone understands that predicting an exact launch date is impossible. It simply 'does not make a lot of sense' to 'trick[] the public into thinking . . . an event will occur a few months earlier than it apparently will when Defendants obtain no benefit and the entire world will see when a huge rocket ultimately test-launches from Wallops Island." Docket No. 82, at 19:2-6 (omitting internal citation to Docket No. 79, at pgs. 10-11 of 11).

fraud caused an economic loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005); *see also Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014). Part of this involves alleging "that 'the truth became known.'" *Genius Brands*, 97 F.4th at 1184 (quoting *Dura Pharm.*, 544 U.S. at 347). "The most common way for plaintiffs to prove that 'the truth became known' is to identify one or more corrective disclosures." *Id.* (omitting internal quotation marks). "A plaintiff does not, of course, need to *prove* loss causation in order to avoid dismissal; but the plaintiff must properly allege it." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008). Rule 9(b)'s heightened pleading standards apply to allegations of loss causation, as with all elements of a securities fraud claim. *See Or. Pub. Emps.*, 774 F.3d at 605.

We are presented here with a situation involving a loss causation theory that is tied to a report written by an acknowledged short-seller, Bleecker Street Research ("Bleecker"). *See* SAC ¶¶ 4-6, 40-47, 98-100 & nn.4-5. In that setting, Defendants argue that Plaintiff cannot establish loss causation under the Ninth Circuit's approach to such reports, reflected in *Houston Municipal Employees Pension System v. Bofl Holding, Inc. (In re Bofl Holding, Inc. Securities Litigation)*, 977 F.3d 781, 790, 795 (9th Cir. 2020), *In re Nektar Therapeutics Securities Litigation*, 34 F.4th 828, 840 (9th Cir. 2022) and *Espy*, with Defendants particularly focusing on the second of those three cases.

*Nektar* repeated the reasoning *Bofl Holding* when that earlier decision assessed anonymous short-seller blog posts:

> The posts were authored by anonymous short-sellers who had a financial incentive to convince others to sell, and the posts included disclaimers from the authors stating that they made "no representation as to the accuracy or completeness of the information set forth in this article." A reasonable investor reading these posts would likely have taken their contents with a healthy grain of salt.

*Nektar*, 34 F.4th at 840. It then applied that reasoning to a published "report" that likewise was "authored by anonymous short-sellers who had a financial incentive to convince others to sell, and the [report] included disclaimers from the authors stating that they made 'no representation as to the accuracy or completeness of the information set forth in this article.'" *Id.*; *see also id.* at 833-34.

Plaintiff's response on this point is to first assert that the Ninth Circuit has endorsed a "flexible approach to evaluating corrective disclosures," which can "come

from any source," quoting *In re Bofl Holding*, 977 F.3d at 790, 795. *See also Genius Brands*, 97 F.4th at 1184 ("In the end, a corrective disclosure can . . . come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters.") (omitting internal quotation marks). Then, addressing Defendants' reliance on *Nektar*, Plaintiff takes the position that the corrective report in question in this case was, unlike *Nektar*, "authored by a well-known, short-seller firm, not anonymous authors . . . with no apparent history in publicizing short ideas." Docket No. 87, at 19:28-20:2. He argues that, in *Espy*, the Ninth Circuit allowed for reports like Bleecker's here to serve as a plausible loss causation allegation because, in part, the reports "had associated contact information that would allow investors to verify reliability." *See Espy*, 99 F.4th at 541 ("The Citron and Hindenburg reports differ from the blog posts and reports held to be insufficient in *Bofl*, *Grigsby* [*v. Bofl Holding, Inc.*, 979 F.3d 1198 (9th Cir. 2020)], and *Nektar*. Most notably, Citron and Hindenburg are well-known short-seller firms whose reports are not 'anonymous,' unlike the blog posts in *Bofl* and *Grigsby* or the Plainview report in *Nektar*, which had no associated contact information that would allow investors to verify the report's reliability.").

In addition, Plaintiff asserts that Bleecker "did not disavow the accuracy of its findings" because its report "clearly expressed Bleecker's belief that the information provided is accurate and reliable." Docket No. 87, at 20:12-13. In so doing, however, Plaintiff ignores that the very language he quotes from the report also states that the information in the report is "presented 'as is,' without warranty of any kind," and that Bleecker "makes no representation, express or implied, as to the accuracy . . . or completeness of any such information." *Id.* at 20:18-21. He nevertheless feels that this language can be disregarded here because, unlike in *Nektar*, Bleecker also said that "[t]o the best of [its] ability and belief, all information contained [in the report] is accurate and reliable." *Id.* at 20:15-16, 20:22-24. But, as Defendants point out in their Reply (relying on material that is permissible to consider by way of judicial notice), the report involved in *Nektar* included that exact same language (even if the language did not make it into the Ninth Circuit's opinion in the case). *See* https://s3.amazonaws.com/plainviewllc/Nektar+Therapeutics+Report.pdf (last viewed April 9, 2026).

Even ignoring this lack of any distinction from the facts before the courts in *Nektar*, Bleecker was clearly attempting to speak out of both sides of its "mouth" here. The language Plaintiff relies on is effectively meaningless given the disclaimer that follows it. Bleecker unquestionably "disavowed any accuracy" in its report, even though it stated that it "belie[ved]" the information it provided was accurate and reliable.

Returning to the question of anonymity, is the fact that Bleecker itself was identified with the report enough to avoid that problem, or was the identity of the actual individual who wrote it the important consideration? Defendants have identified a (pre-*Espy*) case that has concluded it is the latter. *See Ng v. Berkeley Lights, Inc.*, No. 21-cv-09497-HSG, 2024 WL 695699, at *16 n.7 (N.D. Cal. Feb. 20, 2024) (rejecting argument that report of "well-known 'activist' short-seller entity" distinguishes case from approach in *Nektar* and other short-seller cases because "the identity of the entity that sponsored the report (as opposed to the identity of any actual person who wrote the representations in it) does not change the 'character' of the report itself – namely, that it was based on secondhand information gathered by a self-interested short-seller"); *see also In re LexinFintech Holdings Ltd. Sec. Litig.*, No. 3:20-cv-1562-SI, 2021 WL 5530949, at *15-16 & n.12 (D. Or. Nov. 24, 2021) ("Plaintiffs asserted at oral argument that Grizzly is not 'anonymous' because the Grizzly website identifies its owner and operator, Siegfried G. Eggert. The site also, however, states that the 'analyst team consists of trained account[ant]s, economists, and engineers,' and thus it does not appear that Mr. Eggert is necessarily the author of the Grizzly report."). Indeed, *Espy* itself described *Nektar* as dealing with "a report from an anonymous *author* at Plainview LLC." *Espy*, 99 F.4th at 541 (emphasis added).

With respect to Plaintiff's reliance on *Espy* in association with this issue, Defendants characterize that decision as providing *dicta* on the topic. The Court agrees. In that case, the Ninth Circuit concluded that, even accepting that the reports in question could be considered for purposes of loss causation, they did "not qualify as corrective disclosures" because they did not "relate back" to the alleged misrepresentations in the case or because they were "based entirely on public information" not requiring "expertise or specialized skills beyond what a typical market participant would possess" that would have already been reflected in the company's stock price. *Espy*, 99 F.4th at 541; *see also*

*Pujo v. EHang Holdings Ltd.*, No. 2:23-cv-10165 MWC (DFMx), 2025 WL 1242324, at *11 (C.D. Cal. Mar. 26, 2025) (noting what the Ninth Circuit ultimately "found" in *Espy*). As such, given the approaches to the issue taken in *Ng* and *In re LexinFintech*, and the conclusion that the language in *Espy* (which itself appeared to focus on the author source, not just the publication source) supporting a different conclusion was *dicta*, the Court disagrees with Plaintiff that the *holding* in *Espy* allows the Bleecker Report to serve as a loss causation-qualifying corrective disclosure here.

Like scienter, then, Plaintiff's loss causation allegations come up short, with no suggestion for how they can be corrected to be viable. Due to deficiencies in both of these elements, Plaintiff's Rule 10b-5 claim will again be dismissed. The Court does not see a need to address the parties' arguments concerning falsity and/or application of the statutory safe harbor for forward-looking statements.

<u>Section 20(a)</u>

Having failed to sufficiently state a Rule 10b-5 claim, Plaintiff's derivative Section 20(a) claim necessarily fails as well. *See Zucco Partners*, 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b).").

<u>Amendment</u>

As the Court has already explained, it has already given Plaintiff one opportunity to amend (though specifically with respect to scienter). Plaintiff has not solved the problems with those allegations, and offers no reason to hope that anything would change given another opportunity. Plaintiff also comes up short with respect to loss causation, and he has not suggested that he has some entirely different "corrective disclosure" separate from Bleecker's report that is waiting in the wings. Given the opportunity for amendment already-extended and the lack of any indication that anything meaningful could be added or changed, the Court concludes that a further opportunity to amend is not warranted. Plaintiff's case is therefore dismissed with prejudice.